Good morning ladies and gentlemen, this is the first time that I've been on this bench for a while. I see we all have new equipment of some sort, I don't know what it is. It's got a screen on it, it doesn't show your picture. The first case this morning is Owner-Operator Independent Driver v. United States Department of Transportation. Mr. Call? That's an inauspicious beginning. I have all my sympathy, it's happened to me too. Go ahead and pick it up, I'd feel better than my cases. Good morning and may it please the court. My name is Paul D. Cullen Sr. I'm honored to appear here today on behalf of the petitioners. The Owner-Operator Independent You have a lovely, well-modulated voice, but if you get raised, you get an old man like me in the act too. Mr. Elrod and Mr. Pringle are drivers, actual drivers. Mr. Elrod resides in Indiana and Mr. Pringle in Wisconsin. The final rule, which is before Your Honor today for review, requires the deployment of 3.4 million electronic recording devices that have one purpose, to monitor and enforce compliance of the hours of service regulations by commercial truck drivers. This rule should be vacated because there are four separate elements of the statutory mandate, which the agency did not follow in promulgating the rule. First, although the statute requires otherwise, the electronic logging devices, sometimes called ELDs, do not automatically record a driver's hours of service and duty status. Second, the regulations fail to protect drivers from harassment as specifically required by the statute. Third, and quite interestingly, there are two provisions of the statute. One requires FMCSA to institute appropriate measures to guard against confidentiality and to make sure that the hours of service compliance purposes. Well over 90% of the enforcement activities that take place with respect to hours of service are undertaken at the state level by state enforcement officers who receive federal grants for their help and assistance. Nowhere does the regulation address the responsibility of state enforcement officers with respect to confidentiality and the use of the data. There are also substantial issues arising under the Fourth Amendment. Turning to the question of automatically, 49 U.S. Code 31137 provides in two sections, I'll combine them, A1 and F1A. It says, the secretary shall prescribe regulations requiring that a commercial motor vehicle be equipped with an electronic logging device capable of recording a driver's hours of service and duty status accurately and automatically. The regulation, which was promulgated in part of the final rule, provides at section 395.2 that the electronic logging device that it sponsors means a device or technology that automatically records a driver's driving time and facilitates the recording of other things. That does not follow a statutory mandate. And the section 31137A tells us that the purpose of the statute, the purpose of the ELD, is to improve compliance with the hours of service. 31137E3 says that the purpose is to determine compliance. There is no way, if you're not recording automatically changes in duty status. Mr. Cullen, your argument, as I understand it, seems to be that any device that fails to record the difference between being on duty but not driving, off duty or sleeping without additional input from the driver fails. Is that right? The device that was proposed does not do either. This regulation fails. Is that correct? Yes, that is correct. Okay, the problem that I have with that is that your theory seems to be that Congress ordered the agency to invent a square circle. That is, to comply with your automatic argument, a device would seem to have to be unbelievably intrusive. It would be able to detect whether the driver was asleep or not, right? That's your argument. It must record whether he is asleep or not, and it must do so automatically. All without harassment and without intruding unduly on his privacy, right? That's correct. So, your argument seems to be that Congress has given the Department of Transportation an impossible job. Is that right? Wrong. The agency itself admits at page 32 of the Short Appendix that technology exists that is capable of accomplishing these goals. Without undue intrusion on privacy or potential for harassment? And Fourth Amendment violations? There is nothing in the record that develops the nature of the device that can accomplish these things or that proposes any activities, actions, safeguards which would prevent undue intrusion. Those issues are not before the court. They are not in the record. The question, though, is whether your legal arguments would make it impossible for the agency to comply with Congress's mandate. And the record says that technology exists that make it possible to do that. With what consequences, though? Well, there is nothing in the record to support hyperbole by opposing counsel that the sky is falling and that this will operate to the detriment of drivers and anyone else He's only reading your own arguments, though, right? He's reading your arguments about how intrusive this insufficient device would be, right? We haven't argued directly that it is intrusive. We've argued some Fourth Amendment issues that don't deal specifically with the intrusiveness of determining changes in duty status. What Congress did say is that the device must improve compliance with the out-of-service. This device does nothing more than paper logbooks with respect to compliance. We went to some trouble showing you what a paper logbook would look like reporting actual changes in duty status and how those actual changes in duty status are easily masked by an electronic logging device in our opening brief. The fact of the matter is that the electronic logging device creates the illusion of compliance. It masks noncompliance because they enter manually incorrect changes in duty status. You have no way of knowing, reading the output of an ELD, whether the first of the 11 hours that a driver may operate during any given day, whether the first minute is compliant with the out-of-service regulations. Is there any room for improvement with the electronic device in terms of just knowing whether the engine is running? Well, you can tell whether the engine is running, yes. Does that not offer some potential for improvement? What you have here is an 11-hour margin of error. The statute says, tell us whether there's compliance with the out-of-service. The device does not tell you that. Suppose the device shows 11 1⁄2 hours of running time. All right. That shows that the truck was running in excess of the 11 hours permitted, and that is a very small incremental improvement. You don't know whether the first minute was compliant. You don't know whether the fifth hour was compliant. And you don't know that there is nothing in the record to show how many accidents or problems are avoided by that last half hour of driving. As a matter of fact, the agency is well aware that most accidents occur in the first hour or two of driving. That last half hour is so inconsequential that it fails to satisfy the statutory mandate. So should we order elimination of the 11-hour limit? If it doesn't make any sense? That's not an issue that's before the court. I don't think you have the authority to order that. That was approved in litigation in the D.C. Circuit several years ago. That 11-hour limit has the force and effect of law. It may be wise or unwise, but that's what the law is. That's true of much about this case, right? Including Congress's mandate to go with electronic devices and prevent harassment. As difficult a balance as that may impose. Well, I don't think that's all that difficult. The agency is making it look very difficult. If we move on to harassment, the agency says we're only going to look at harassment that is connected somehow with hours of service violations. There's no such limitation in the statute. And they request Chevron deference for that very narrow and limited interpretation. I think that there is some leeway that the agency may have to identify conduct that constitutes harassment. Hanging the driver at night to wake him up and make him drive off. That's the kind of conduct. And there is some leeway to identify harassing behavior. But what the agency did here is take whole areas of harassment and if they're not linked to hours of service, they're not covered by the agency's regulation. Now, the device is intended to deal with hours of service problems. But its capacity for mischief, the capacity to use these devices mischievously and through harassment is much broader than hours of service violations. We go into a great deal of detail there. There is no Chevron deference that ought to be given to that. They may have some leeway to decide on a case-by-case basis conduct, but the actual subject matters of harassment are laid out and there's no qualification. There's no adjective in front of the word harassment. In the Joseph Black case, which we cite in our brief, the agency was required to determine a reasonable collection cost. And so there was a gap. They had to decide what was reasonable and the Chevron deference was made available to them. There's no adjective in front of the word harassment. It doesn't say undue harassment, excessive harassment, harmful harassment. It says harassment. And what they've done is they've stripped back to include and to exclude vast areas where harassment can take place and they should not be accorded Chevron deference. They are not following the statutory mandate. And for that reason, the rule should be vacated. You do not write upon a clean slate. This agency doesn't like the harassment obligations it has. In a wider one, they fail to pay any attention to it at all. In this case, their interpretation is so narrow and miserly that either under step one you don't find ambiguity or under step two, you just come to the conclusion they fail to persuade that these limitations are reasonable. The third point we're going to make is about the requirement that the agency, this is 31137E2 and 3. It says very specifically, the secretary shall institute appropriate measures dealing with appropriate measures to ensure that the ELD is used by enforcement personnel only for the purposes of determining compliance. Does the statute require that restriction be in the regulation itself? That would seem to be a very appropriate measure to take. Does the statute say that? Not whether it's a good idea. The other statutes which enable a secretary to proceed by regulation certainly authorize it. That's not my question. The statute does not say you must proceed by regulation. Thank you. But you have to remember, as we point out on page 45 and 46 of our opening brief, most of the enforcement actions here take place at the state level. By state enforcement officers operating under federal grants. The agency has done, it's not that they've done a bad job. They have done nothing to ensure that these state enforcement officers are ensuring that the ELD data is used only for hours of service compliance. When do these regulations take effect? I believe about a year from now. About a year from now. But the statute says you shall initiate appropriate action. Whether that's by regulation or some other way, you raise an interesting point, Your Honor. But however they do it, they have done nothing right now at the state level and all of the enforcement actions take place at the state level. Could you address your Fourth Amendment arguments? Certainly. In particular, I'm wondering, is the device a problem because of the information it records? The device is a problem because it monitors their activity and intrudes on their privacy. Right. Okay. Does it require reporting of any information the drivers are not already required to report truthfully in paper logs? It does not. So why is this more intrusive? Because they are installing a device in the truck to monitor the driver's behavior. And in the leading case of Burger, the consequences of this are criminal prosecution. We point that out in our brief at the state level. At the federal level, I think it's 49 U.S. Code 521 and 506. On the Fourth Amendment issue, trains and airplanes have cockpit voice and data recorders now. Does the required placement of those devices violate the Fourth Amendment rights of pilots, train engineers, and the operators, the owners of those vehicles? I don't believe it does. Why not? Because they probably have appropriate regulations covering the scope and use of the material. They're kept confidential. It's for a variety of purposes. Why is this different? Under Burger, the purpose of this is directly for criminal enforcement purposes. I know you don't have any control over the questions, but you're in your rebuttal time. I understand that. This is what Burger says. In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance. The government may not use an administrative inspection scheme to search for criminal violations. That's exactly what they're doing here. It is an administrative inspection being used for criminal purposes. It's probably not the case in connection with cockpit recorders. There's no indication. I'm not aware that they're using that for criminal enforcement purposes against pilots. I would be happy to answer any questions, but I'd like to reserve a little time for rebuttal if that would be. You have some time. Thank you, Counsel. Thank you. Mr. May it please the court. My name is Joshua Waldman. I'm here from the United States Department of Justice, representing the respondent United States Department of Transportation. This court should uphold the agency's carefully considered rule, which complies with every one of Congress's statutory instructions and does not violate the Fourth Amendment. I'd like to begin, if I could, with the question of harassment, because that was the issue addressed by this court in the last case. Last time around, this court told the agency it had not sufficiently considered the question of harassment. Since that time, and in accordance with this court's instructions, the agency issued a notice asking drivers specifically for questions about what kind of harassment they were concerned about, how frequently it might occur, and what the agency could do about it. The agency conducted additional listening sessions and a driver survey, and its final rulemaking is largely reflected of the comments that we heard from drivers. Drivers expressed concern about pinging or noises or interruptions in their sleeping berth while they were sleeping. So the agency required a mute button or a volume control where drivers could turn off the noise. Some drivers, including the petitioners themselves, said you need to have a specific regulation that prohibits harassment, and the agency did that and noted in its rulemaking it was responding to these petitioners' comments. They asked for civil penalties for violations of the harassment rule. We added that to the rule. Drivers said they were concerned about unilateral changing of the records by motor carriers, so we made the devices tamper-proof. We kept records of the original records need to be maintained. All communications between the motor carrier and the drivers need to be recorded, and any edits to them need to be attributed to who's editing them to protect the drivers. So everything we did was in specific response to the complaints that we heard from drivers and what they were concerned about. It is not arbitrary and capricious to ask the drivers what they were concerned about. They're the ones who would be suffering from the harassment if it existed, and the agency is entitled to deference on this point. Some of the things that respondent says are things like, well, what if you are pulled over because of bad weather or you're tired but you haven't hit the 11th hour yet? As we explained in our brief, there's a catch-all provision. I think it's 392.3. It says if there's any reason why it's going to affect the driver, fatigue, illness, or any other reason which would include the weather, then that would be a regulatory violation. So the very things that they're complaining about are already within the harassment regulations. As Judge Hamilton pointed out with respect to the statutory provision about automatically recording, these devices of this nature have existed for years in voluntary use by motor carriers, and it's far more likely that when Congress said all motor carriers should adopt these regulations that they were imagining the very technology that existed at the time and not some technology that would represent a sea change, a highly intrusive sea change into the industry, and instead were imagining the very types of devices that had been in existence. And indeed Congress used the same language, but could you address Mr. Cullen's point concerning new technologies that would be able to, for example, distinguish between sleep and off-duty and on-duty but not driving? Well, he said that according to the agency such technology exists. I have no idea what he's referring to. As far as I know, that technology does not exist today. I don't understand even—I'm not a technology person, but I don't even understand how it would exist. Even if you had cameras monitoring drivers every moment 24 hours a day, I'm not sure how you would distinguish between a driver who was off-duty versus a driver who was on-duty but not driving. I don't understand how having a camera on someone would even do that. So I don't know that this technology even exists, but it's hard to imagine that if Congress imagined a technology vastly different from what had been addressed in previous rulemaking, why would they have adopted language from that previous rulemaking? They would have said something, I think, completely different. And as Judge Hamilton also pointed out, you have to construe the statute as a whole, as we always do. And given the privacy concerns and personal data concerns and anti-harassment provision, it's hard to imagine that Congress included all of those things to protect drivers yet wanted a nonexistent technology that would have intruded in every single moment of their life and kept them under constant surveillance. It's not something that is consistent with the statute or that Congress gave any indication it was considering. The last thing that I'd like to address, if I could, well, there's two things. One is the question of do electronic devices help in any meaningful way? And the statute doesn't say you have to eliminate all regulatory violations. It says these are to improve compliance, not to achieve perfect compliance. And it's very simple to see how this could happen. The rule says, for example, you can't drive more than 11 hours in a particular period. In the old rule, you could drive 12 hours and just write down 11 hours, and it would appear that you were in compliance. Today, if you drive past that 11th hour, it's in a tamper-proof electronic record, and there's no way around that. That in itself is an improvement in compliance right there. By virtue of the fact that you can't fabricate certain portions of it, it makes all the other things that much more difficult to get around as well. And in addition, the agency said you still need to have paper supporting documents, not the paper records of driving status, but things like bills of lading and shipping instructions and communications with the motor carrier, toll receipts, all these things that help bolster the case that if you still try to hide a regulatory violation, we will try to catch you. The agency also studied the existing devices that were in voluntary use, and it found, and this is in the record, a dramatic improvement. That's the language of the agency, a dramatic improvement in regulatory compliance. Violations decreased by 86% to 90% for those who use these similar monitoring devices. And just so you have it handy, this is at the volume 2 of the appendix at page 438, if you want to look up the specific data later on. But that shows not only that it's intuitive that these devices improve compliance, but that actually looking at the devices that were in voluntary use proved through real-world experience that that was the case. In short appendix at page 62, the agency also explained how in roadside inspections that the use of electronic devices made regulatory violations either easier to detect or detectable that would not have been detectable otherwise but for the devices. The final thing I'd like to address, Judge Hamilton, is you asked whether the agency had to have these, quote, appropriate measures in the rulemaking. I don't think Congress used the word rulemaking in Section A of the statute when they meant rulemaking, and they used appropriate measures in subsection E,  In short appendix page 32, 31 to 32, this very question was brought up about are records going to be retained by the agency and are they going to be used for other things. And the agency said, no, we're not going to retain these records on a blanket basis. And I think that's an important point that sometimes gets lost. It's not as if these devices are constantly recording information and sending it up to the cloud somewhere where there's a vast government database that collects all these things. No, they're just kept on the device. If there's a roadside stop or a stop at a way station, an enforcement officer can ask for the information then. But unless there's a violation or perhaps there's a crash or some specific reason for keeping the information, it's checked. And if there's no violation, it's not kept by the agency. These things are used to enforce the hours of service regulations, and that's what the agency said it was going to do. Can they be used, for example, for enforcing general traffic laws like speeding limits or to deal with civil liability and accidents? Well, not by the secretary. The secretary does hours of enforcement. And these rules, the statute itself talks about the secretary's use. Now, if there's a private civil lawsuit, what normally would happen is there are the two regulations that all agencies have about disclosing information in the context of civil suits, and those provisions would apply in that case. But in terms of the secretary's use, the secretary is going to use it for hours of service violations. The statute refers to law enforcement officials? Yes. Is that limited to federal officials? Well, it's not clear, but the agency's policy applies to both the agency itself and state enforcement officers. Right. So what's to prevent state police officers, for example, from using this data to enforce speeding regulations or other criminal violations in driving? Well, first of all, the devices specifically don't record speed, or braking function, driving functions. These were all specifically addressed in the rulemaking for exactly these reasons. But more specifically, these state partners who enforce the federal regulations are subject to the policy guidance directed by the agency. And the agency, as it said in the rulemaking, and this is, again, page 32, there's a footnote that said we'll be adopting and implementing protocols and policies as we go forward with the rule, as we approach the implementation date. Given the history, though, you can understand some skepticism on the part of the drivers. That we would issue it? Yes. Well, I happen to have it right here with me, Your Honor, because I understand why I would be skeptical. And this is a memorandum from the Associate Administrator of Enforcement for the agency who issued a policy and guidance memorandum, and it specifically says it's for the FMCSA personnel and Motor Carrier Safety Assistance Program, that's MCSAP, state partners. So all the state law enforcement personnel. Is this a public document? Is it in our record? Is it publicly available? It is not in the record, Your Honor. It is not published on a website, but if Your Honor would like to see a copy of it, we'd be happy to file it with the court. It's not private or privileged in any sense of that. Unsealed? Yes, unsealed. And what it says, and I'll just read the relevant portion, through this policy FMCSA limits the use of ELD records as defined in 49 CFR 39395.2 for enforcement of the HOS, that's hours of service, requirements in 49 CFR Part 395. And then they go on to say there's going to be records in there that they're going to use as evidence to prove those regulatory violations. For example, the ELD will have the identity of the driver, which is obviously a piece of evidence needed to show a regulatory violation. But they all go towards the violations themselves. So we've issued the appropriate measures, I think, to limit the use of this information to hours of service and the related safety regulations, which is what the statute says that we need to do. Would the court like a copy of this one? Would you like me to file a copy of it? Yes, please. Okay. I'd be happy to do so. I'm also happy to answer any other questions that Your Honors may have. Could you turn to the Fourth Amendment issues? Sure.  Well, I think that, in my mind at least, the administrative, the pervasively regulated industry exception is similar to the special needs doctrine in the sense of it's circumscribed by law.  And the very reason why it's a pervasively regulated industry is because of these safety concerns. I think we'd be happy to win the Fourth Amendment argument on any of those doctrines. But we don't think that we necessarily even need to get into that question because we don't view it as either a search or a seizure under the Fourth Amendment. Well, suppose Congress told the National Highway and Traffic Safety Administration to issue rules to impose similar, to include similar monitoring devices on every passenger car in the United States. It would monitor, let's say, a few other things including speed and the like. Would that pose Fourth Amendment concerns? That's an interesting question. You don't have a pervasively regulated industry. It's not a pervasively regulated industry. I don't think that you would have, depending, I assume that people would just buy the cars with this stuff. Let's go with that assumption. So we're not in a Jones trespass type of situation. Right. And we're not in a pervasively regulated industry. But you can't buy a car without one. But you can't buy a car without one. I think one of the questions that you might want to ask under Jones, and I think I'd need to know more about this hypothetical, is exactly how are people tracked? How much is it like the real-time tracking, a precise location, that kind of thing? Or does it only track speed from a driver? And I think, Your Honor, I don't think we have that question in this case. I'd be hesitant to sort of come down definitively on whether it's a Fourth Amendment violation. I'm just trying to figure out. You've got a number of different Fourth Amendment doctrines in play here. Yes. And some would seem to apply in that situation and some not. I think you're right, and I think we went on any and all of them. But I think the simplest way is to say that it's not a search or a seizure. And as Mr. Cullen said before, the information that's collected in these devices is really qualitatively no different from the paper rods that were required before. And so if that was not a Fourth Amendment violation, as I don't think anyone argues that it was, it's hard to see why this would be a Fourth Amendment violation. And I think that's a sufficient basis on which to rule here. I just had one other question I'd like to raise, and that has to do with the cost-benefit analysis. Sure. You've argued that there is no requirement for this rule because Congress just told the agency to issue it. That's correct. If you are correct about that, the petitioners have told us, though, that would seem to undermine other statutory requirements as they've laid out in their reply brief. I was wondering if you could address that. Well, I don't read the statute quite the same way that they do. First of all, I would say we're not afraid of our cost-benefit analysis at all. So I think if you thought that we needed to do one, I think it was more than adequate. But the provisions that they're talking about are in Section 31136, and Congress there said when you're issuing a rule under this section, consider all of these following things. But Congress didn't put the ELD requirement in 31136. It put it in 31137. So the provisions, what Congress said consider to do, still stand with respect to those regulations that are pursuant to 31136, but they're limited to that particular section. And in 31137, where Congress said not think about ELDs, but do it, require it, after years of saying think about it, consider it in rulemaking, Congress finally said do it. And they said very specific things about what to consider, that they don't harass drivers. Consider confidentiality of data and privacy. And they had a whole host of specific technological things that the devices needed to have. But what they didn't say is cost-benefit analysis, which they had said in the other statute with respect to other rules. And the reason they didn't is because after decades of saying think about it, Congress finally said this improves compliance. And we know it. Just do it. Go ahead and do these devices. You don't have to figure out whether it's worth it. We know that it's worth it. These things help catch violations. People have been using them for years. They've been dramatically improving compliance for the people who voluntarily use it. We don't need to weigh it anymore. What we need you to do is require motor carriers to install them. But if that doesn't affect all of the other things that Congress said, you need to consider for other rulemaking in 31136 because that's a different section of the statute. If there's any other questions from the court, I'd be happy to answer them. Otherwise, I'd ask the court to uphold the agency's carefully considered rule. Thank you, Counsel. How much time? One minute. You have one minute, Counsel. As bar requests, you get two, and you get two. Counsel says that Congress has made a determination that ELDs will improve compliance. We don't read it that way. But even if you do read it that way, it is contingent upon automatic recording of changes in duty status and hours of service. Without that automatic, there's going to be no improvement in anything because you cannot tell whether a person has violated the hours of service rule unless you have accurate information on changes in duty status. A question was asked about the special needs beyond the ordinary needs of law enforcement, why hasn't it come up? The answer is very simple. This statute and this regulatory regime is designed for the ordinary needs of law enforcement. 49 U.S. Code Section 521B-6 and 49 U.S. Code 526 provide criminal sanctions for violating these regulations. And at the state level, we cited on page 55 of our brief in the footnote, Illinois, Indiana, and Wisconsin all impose, all within this circuit, all impose criminal sanctions for violation. So the ordinary needs doesn't apply. The statute does require the agency to initiate appropriate measures. Whether they do that by regulation or some other nonstandard way, they must initiate appropriate measures to ensure compliance and to preserve confidentiality. They have not done it badly. They have not done it at all at the state level, and they're required to. For that reason alone, this mirrors their default in OI-1 where they did absolutely nothing about harassment. Counselor, your time has expired. I have so many interesting things to say, but thank you very much for your time. Thank you very much. Thanks.